# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

Montez L. Taylor,

      Petitioner,

vs.

                              Case No. 1:05cv526
                              (Weber, S.J.; Black, M.J.)

Ernie Moore,

      Respondent.

# REPORT AND RECOMMENDATION

Petitioner, who is incarcerated at the Lebanon Correctional Institution in Lebanon, Ohio, has filed a *pro se* petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. This matter is before the Court on the petition; respondent's return of writ with exhibits; petitioner's "traverse" in reply to the return of writ; the manually-filed transcripts from petitioner's state criminal trials; and additional photographic exhibits filed by respondent to assist the Court in the adjudication of petitioner's claims. (Docs. 1, 7, 14, 24-25; *see also* Docs. 8-10).[1]

---

[1] On April 12, 2007, in response to an informal request made by court personnel, respondent submitted pages of the trial transcript, which had been "inadvertently omitted" from the record initially filed with the Court. (Doc. 24). On June 11, 2007, respondent also submitted certain photographic exhibits of petitioner and another individual, who was with petitioner when the crimes were committed, that were introduced into evidence at petitioner's retrial. (Doc. 25).

## Factual And Procedural Background

On August 3, 2001, the Hamilton County, Ohio, grand jury returned an indictment charging petitioner with two counts of aggravated murder in violation of Ohio Rev. Code § 2903.01(A); firearm and death penalty specifications were attached to each count. (Doc. 7, Ex. 1).

Petitioner's counsel filed a motion "to exclude any evidence relating to other crimes, wrongs or acts," which was denied. (*Id.,* Exs. 2, 4). Petitioner's first trial concluded on March 6, 2002, when the trial court discharged the jury because it was unable to reach a verdict. (*See id.,* Ex. 5). Thereafter, petitioner was retried before another jury and was convicted on June 26, 2002 of both counts of aggravated murder and attached specifications. (*Id.,* Ex. 6).[2]

After a mitigation hearing, the jury recommended that petitioner be sentenced to life imprisonment with no parole eligibility. (*Id.,* Ex. 8). On July 16, 2002, the trial court adopted the jury's recommendation and sentenced petitioner to life terms of imprisonment with no parole eligibility for the aggravated murder offenses, as well as consecutive three (3) year terms of imprisonment on the firearm specification attached to each count. (*Id.,* Ex. 9). In addition, the sentence was to be served consecutively to a sentence imposed in another separate criminal case. (*Id.*).

With the assistance of new counsel, petitioner timely appealed to the Ohio Court of Appeals, First Appellate District. (*See id.,* Ex. 10). Petitioner presented five assignments of error for appellate review, including the following claims:

> **First Assignment Of Error:** The trial court erred by overruling Taylor's motion to suppress the eyewitness identification testimony ... [w]hen under the totality of the circumstances, the identification procedures are so unduly suggestive as to give rise to a substantial likelihood of irreparable misidentification. . . .

****

---

[2] One of the two firearm specifications attached to each count was dismissed upon the State's request. (*See* Doc. 7, Ex. 7).

**Third Assignment Of Error:** The trial court erred when it failed to enforce its order that the witnesses be separated.

**Fourth Assignment Of Error:** The trial court erred in allowing the state to introduce evidence of Taylor's various "other acts."

**Fifth Assignment Of Error:** The trial court erred in entering a judgment of conviction following a trial replete with prosecutorial misconduct[,] . . . [which] deprived the Defendant-Appellant of a fundamentally fair trial. . . .

(*Id.,* Ex. 11).

On March 26, 2004, the Ohio Court of Appeals overruled petitioner's assignments of error and affirmed the trial court's judgment. (*Id.,* Ex. 13). In its Decision, the court made the following findings of fact, which are presumed correct under 28 U.S.C. § 2254(e)(1),[3] regarding the events that resulted in petitioner's convictions:

> In the early evening of July 23, 2001, Clem Turner and Lornie Pierre Starkey were traveling in Turner's red Honda CRV on a residential street in Pleasant Ridge. A red Ford Escort containing two men approached Turner's Honda from the opposite direction. The driver of the Escort fired a gun into the Honda. The Honda accelerated, running off the road, hitting a tree, tipping over and coming to rest on the driver's side. The driver of the Escort backed up to the overturned Honda, got out of his vehicle, approached the Honda, and fired into it, killing Turner and Starkey. The driver then got back into the Escort and drove away.

---

[3] 28 U.S.C. § 2254(e)(1) provides that "[i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed correct" unless petitioner rebuts the presumption by "clear and convincing evidence." Petitioner has neither cited nor presented any evidence to rebut the Ohio court's factual findings quoted herein. Therefore, petitioner has not demonstrated by clear and convincing evidence that such findings are erroneous.

Witnesses noted the Escort's license plate number. The Escort was registered to Shirley Fairley, the mother of defendant-appellant Montez L. Taylor. Police determined that Taylor had been driving his mother's car. Taylor was subsequently arrested at his mother's house. He denied any knowledge of the killings.

Early the next morning, police showed seven witnesses a photographic array that included Taylor's picture. Four of the seven witnesses picked Taylor's photograph out of the array. That same morning, police received a Crimestoppers tip that Taylor and David Dion Johnson had been together right before the murders. The police initially were unable to locate Johnson because he had fled to California. Witnesses were never shown a photograph of Johnson.

Taylor was indicted for two counts of aggravated murder with death penalty and firearm specifications. While Taylor was awaiting trial, he was charged with assaulting a Hamilton County corrections officer. Taylor's first capital murder trial ended with a hung jury. Prior to the retrial of his capital case, Taylor was tried and convicted for the assault on the corrections officer. His sentencing for the assault conviction was continued until after the homicide retrial.

Taylor's retrial on the aggravated murder charges began on June 17, 2002. David Johnson testified that he had been a passenger in the Escort on the day that Turner and Starkey were killed. Johnson stated that earlier that day he had "had words" with Turner. Later, Johnson testified, Taylor picked him up in the Escort. When Johnson told Taylor about the argument with Turner, Taylor became angry. The Escort passed the Honda, which Johnson recognized as Turner's vehicle. Johnson stated that Taylor had fired into the Honda. After the Honda had flipped over, Taylor got out of the Escort, walked over to the Honda and fired through the windows at the victims. According to Johnson's testimony, after Taylor had returned to the Escort, the two drove to Johnson's girlfriend's house, where Taylor changed the license plates on the Escort.

4

After the murders, Johnson fled to California. Johnson's grandmother testified that Johnson had gone to California because his life had been threatened. She also testified that Taylor had telephoned her from prison and had told her that Johnson had had nothing to do with the murders.

The state presented the testimony of several eyewitnesses to the murders. The witnesses identified Taylor, and not Johnson, as the killer. There was also testimony that police had recovered a holster from the Escort. The murder weapon was never recovered. Taylor testified in his own defense, claiming that Johnson had committed the murders. . . .

(*Id.*, pp. 2-4).

Petitioner's counsel timely appealed to the Supreme Court of Ohio, asserting as propositions of law the following two claims:

**Proposition of Law No. 1:** A trial court errs when it permits the state to introduce evidence that a defendant committed prior "bad acts" to show that he acted in conformity therewith.

**Proposition of Law No. 2:** Continuous misconduct by the prosecution, which prejudices the defendant's right to a fair trial, violates due process and requires reversal of the conviction.

(*Id.*, Exs. 14-15). On August 4, 2004, the state supreme court denied petitioner leave to appeal without opinion. (*Id.* Ex. 17).

On June 22, 2005, petitioner next filed a *pro se* petition to vacate or set aside judgment with the Hamilton County Common Pleas Court. (*Id.*, Ex. 18). In this petition for post-conviction relief, petitioner claimed that the trial court erred in sentencing him "to non-minimum sentences based on facts not found by the jury or admitted by petitioner" in violation of *Blakely v. Washington*, 542 U.S. 296 (2004), and *United States v. Booker*, 543 U.S. 220 (2005). (*Id.*).

On July 20, 2005, the common pleas court denied the petition for post-conviction relief "under the authority of *State v. Merriweather* (April 20, 2005) 1st Dist. Case No. C030948, which held that *Blakely* and *Booker* 'do not apply retrospectively to cases on collateral review.'" (*Id.,* Ex. 20). Petitioner timely appealed this decision to the Ohio Court of Appeals, First Appellate District. (*See id.,* Ex. 21-22). As of December 9, 2005, when respondent filed the return of writ in the instant action, the Ohio Court of Appeals had not decided petitioner's appeal. (*Id.,* Brief, p. 4 & Ex. 23).[4]

Petitioner commenced the instant federal habeas corpus action in August 2005, soon after the trial court denied the post-conviction petition. The federal habeas petition, which was signed by petitioner on August 2, 2005, was stamped as "filed" on August 8, 2005. (Doc. 1). In the petition, petitioner alleges four grounds for relief.

> **Ground One:** The trial court erred when it permit[ted] the state to introduce evidence that a defendant committed prior "bad acts."

> **Ground Two:** Prosecutorial misconduct . . . which prejudice[d] the defendant's right to a fair trial. . . .

> **Ground Three:** . . . .There was clearly a violation of the separation of witnesses [when] three eyewitnesses to the murders [were introduced by the prosecutor] to [David] Johnson [prior to his testimony] in the hallway outside the courtroom and [were] asked was he (Johnson) the shooter.

> **Ground Four:** [The] photographic array [shown] witnesses was impermissibly suggestive. . . .

---

[4] Upon review of state court docket records available on the internet, it appears that the Court of Appeals affirmed the trial court's judgment on July 27, 2006, and that petitioner did not pursue a further appeal to the Supreme Court of Ohio.

(*Id.*, pp. 5-6).[5]

It neither appears, nor has been argued as a defense, that the petition is barred from review on statute of limitations grounds. It further appears that petitioner has exhausted all available state-court remedies with respect to the grounds for relief asserted in the petition.

Respondent contends in the return of writ that petitioner has waived the claims alleged in Grounds One, Three and Four due to his procedural defaults in the state courts. (Doc. 7, Brief, pp. 7-12). Respondent further argues that the claims alleged in Grounds One and Two lack merit. (*Id.*, pp. 15-24).

## OPINION

### A. Petitioner Has Waived The Claims Alleged In Grounds Three and Four

In recognition of the equal obligation of the state courts to protect the constitutional rights of criminal defendants, and in order to prevent needless friction between the state and federal courts, a state defendant with federal constitutional claims must fairly present those claims to the state courts for consideration before raising them in a federal habeas corpus action. *See* 28 U.S.C. § 2254(b)(1), (c); *see also Anderson v. Harless,* 459 U.S. 4, 6 (1982) (per curiam); *Picard v. Connor,* 404 U.S. 270, 275-76 (1971). A constitutional claim for relief must be presented to the state's highest court in order to satisfy the fair presentation requirement. *See O'Sullivan v. Boerckel,* 526 U.S. 838, 845, 848 (1999); *Hafley v. Sowders,* 902 F.2d 480, 483 (6th Cir. 1990); *Leroy v. Marshall,* 757 F.2d 94, 97, 99-100 (6th Cir.), *cert. denied,* 474 U.S. 831 (1985).

If petitioner fails to fairly present his claims through the requisite levels of state appellate review to the state's highest court or commits some other

---

[5] It is noted that four months after filing the petition containing these four grounds for relief, petitioner filed a motion to stay this action while he continued to exhaust his *Blakely/Booker* claim in the state post-conviction appeal proceedings. (Doc. 6). Petitioner also sought permission to amend the petition to add a *Blakely* claim as a ground for habeas relief. (*Id.*, p. 2). On August 14, 2006, the undersigned issued a Report and Recommendation to deny petitioner's motion for stay and to amend the petition to include a *Blakely* claim. (Doc. 21). The Report and Recommendation was adopted as an Order on September 12, 2006. (Doc. 22).

procedural default relied on to preclude review of the merits of the claims by the state's highest court, and if no avenue of relief remains open or if it would otherwise be futile for petitioner to continue to pursue his claims in the state courts, his claims for habeas corpus relief are subject to dismissal with prejudice on the ground that they are waived. *See O'Sullivan,* 526 U.S. at 847-848; *Harris v. Reed,* 489 U.S. 255, 260-62 (1989); *McBee v. Grant,* 763 F.2d 811, 813 (6th Cir. 1985); *see also Weaver v. Foltz,* 888 F.2d 1097, 1099 (6th Cir. 1989).

If, because of a procedural default, petitioner has not had his claims considered by the state's highest court and he can no longer present his claims to the state courts, he has waived the claims for purposes of federal habeas corpus review unless he can demonstrate cause for the procedural default and actual prejudice resulting from the alleged constitutional errors, or that failure to consider the claims will result in a "fundamental miscarriage of justice." *Coleman v. Thompson,* 501 U.S. 722, 750 (1991); *see also Murray v. Carrier,* 477 U.S. 478, 485 (1986); *Engle v. Isaac,* 456 U.S. 107, 129 (1982); *Wainwright v. Sykes,* 433 U.S. 72, 87 (1977).

In this case, as respondent has pointed out (*see* Doc. 7, Brief, pp. 11-12) and petitioner has conceded (*see* Doc. 14, p. 1), petitioner procedurally defaulted the claims alleged in Grounds Three and Four of the petition, because although he presented the claims as assignments of error on direct appeal to the Ohio Court of Appeals, he did not assert them as issues to be addressed on further discretionary review by the Supreme Court of Ohio. (*See* Doc. 7, Exs. 11, 15); *see also O'Sullivan,* 526 U.S. at 845, 848; *Leroy,* 757 F.2d at 97, 99-100. Because petitioner thus failed to provide the state's highest court with the opportunity to correct the alleged errors, he has waived such claims absent a showing of cause for his default and actual prejudice as a result of the alleged errors, or that failure to consider the claims will result in a "fundamental miscarriage of justice." *See Coleman,* 501 U.S. at 750; *see also Murray,* 477 U.S. at 485; *Isaac,* 456 U.S. at 129; *Sykes,* 433 U.S. at 87.

Petitioner concedes that he is unable to demonstrate "cause" for his default, because he cannot argue that his appellate counsel provided ineffective assistance

on discretionary appeal to the Supreme Court of Ohio. (*See* Doc. 14, pp. 1-2).[6]

Petitioner also has not demonstrated that a "fundamental miscarriage of justice" will occur, or in other words, that the alleged constitutional violations "probably resulted in the conviction of one who is actually innocent" of the crimes charged, if the claims alleged in Grounds Three and Four are not considered on the merits herein. *See Murray,* 477 U.S. at 495-96; *see also Schlup v. Delo,* 513 U.S. 298, 327 (1995); *cf. Souter v. Jones,* 395 F.3d 577, 597-602 (6th Cir. 2005). To be credible, a claim of actual innocence requires petitioner to support his allegations "with new reliable evidence . . . that was not presented at trial" either because it was wrongly excluded or unavailable at the time of trial. *Schlup,* 513 U.S. at 324. No such showing has been made in this case.

Accordingly, the undersigned concludes that petitioner has waived the claims alleged in Grounds Three and Four of the petition, based on his failure to provide the Supreme Court of Ohio with an opportunity to correct the alleged errors in the direct review proceedings.

---

[6] As petitioner understood, the constitutional right to effective assistance of counsel does not extend beyond the first appeal as of right to subsequent state discretionary appeals or collateral review. *See Coleman v. Thompson,* 501 U.S. 722, 755-57 (1991) (relying on *Ross v. Moffitt,* 417 U.S. 600, 616 (1974), and *Pennsylvania v. Finley,* 481 U.S. 551, 556 (1987)); *cf. Wainwright v. Torna,* 455 U.S. 586, 587-88 & n.4 (1982) (per curiam) (holding that petitioner was not denied due process by the state supreme court's dismissal of an untimely-filed application for discretionary review or by retained appellate counsel's failure to file a timely application for discretionary review with that court, because petitioner neither had an absolute right to appeal his conviction to the state supreme court nor a constitutionally-protected right to effective assistance of counsel in seeking discretionary review by the state supreme court). Therefore, although, as the Supreme Court held in *Murray,* 477 U.S. at 488, counsel's constitutionally deficient performance may constitute "cause" for a procedural default, no such argument can be made in this case.

9

**B. Petitioner Is Not Entitled To Relief Based On The Claim Alleged In Ground One, Because He Has Waived Any Federal Constitutional Claim and The State-Law Claim Is Not Cognizable In This Federal Habeas Proceeding**

In Ground One of the petition, petitioner alleges that the trial court erred when it allowed the State to introduce his prior "bad acts" into evidence. (Doc. 1, p. 5).

As an initial matter, the Court is precluded from reviewing this claim to the extent petitioner asserts he is entitled to relief due to an alleged violation of Ohio Rev. Code § 2945.59, Ohio R. Evid. 404(B) or other state evidentiary rules. A federal court may review a state prisoner's habeas petition only on the ground that the challenged confinement violates the Constitution, laws or treaties of the United States, and not "on the basis of a perceived error of state law." 28 U.S.C. § 2254(a); *Pulley v. Harris,* 465 U.S. 37, 41 (1984); *see also Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991) ("it is not the province of a federal court to reexamine state-court determinations on state-law questions"); *Bugh v. Mitchell,* 329 F.3d 496, 512 (6th Cir.), *cert. denied,* 540 U.S. 930 (2003).

Therefore, this Court may only consider whether the alleged error violated petitioner's federal constitutional right to due process. However, as respondent argues in the return of writ and petitioner concedes (*see* Doc. 7, Brief, pp. 9-11; Doc. 14, p. 1), it appears petitioner has waived any such constitutional claim because he failed to present the federal issue on direct appeal.

It is well-settled that in order to satisfy the "fair presentation" requirement discussed above, *see supra* p. 7, a habeas corpus petitioner must present both the factual and legal underpinnings of his claims to the state courts. *McMeans v. Brigano,* 228 F.3d 674, 681 (6th Cir. 2000), *cert. denied,* 532 U.S. 958 (2001); *Franklin v. Rose,* 811 F.2d 322, 325 (6th Cir. 1987). This means the petitioner must present his claims to the state courts as federal constitutional issues and not merely as issues arising under state law. *Franklin,* 811 F.2d at 325 (citing *Koontz v. Glossa,* 731 F.2d 365, 368 (6th Cir. 1984)); *see also Prather v. Rees,* 822 F.2d 1418 (6th Cir. 1987). A claim will be considered "fairly presented" without citation to chapter and verse of the Constitution only if the presentation of the claim was "likely to alert the court to the claim's federal nature." *Nadworny v. Fair,* 872 F.2d 1093, 1097 (1st Cir. 1989) (quoting *Daye v. Attorney General of*

*New York,* 696 F.2d 186, 192 (2nd Cir. 1982) (en banc)).

A set of four guidelines has been developed for determining whether a claim was presented in such a way as to alert the court of the claim's federal nature. *Id.* Under these guidelines, a petitioner may fairly present to the state courts the constitutional nature of his claim by (1) relying on federal cases employing constitutional analysis; (2) relying on state cases employing constitutional analysis in similar factual contexts; (3) phrasing the claim in terms of constitutional law or in terms sufficiently particular to allege a denial of a specific constitutional right; or (4) alleging facts well within the mainstream of constitutional law. *McMeans,* 228 F.3d at 681; *Franklin,* 811 F.2d at 326 (quoting *Daye,* 696 F.2d at 193-94).

The use of a "generalized catch-all phrase," which merely alleges the denial of a fair trial under the United States Constitution, does not adequately alert the state courts of the constitutional nature of the claim where the "only legal theory presented to the state courts was predicated entirely upon state evidentiary law." *Franklin,* 811 F.2d at 326. General statements that the petitioner was denied a "fair trial" and "due process" are not sufficient to put state courts on notice of a specific federal constitutional claim in the absence of citation to case law employing federal constitutional analysis. *Petrucelli v. Coombe,* 735 F.2d 684, 688-89 (2nd Cir. 1984).

In this case, petitioner failed to fairly present to the Ohio appellate courts any claim of a federal due process violation stemming from the improper admission of "other acts" evidence. In his briefs on appeal to the Ohio Court of Appeals and Supreme Court of Ohio, petitioner relied solely on Ohio R. Evid. 404(B) and 403, as well as state cases construing those state evidentiary rules, in arguing that the trial court "abused its discretion" and committed "prejudicial error" when it allowed the "other acts" evidence to be introduced at trial. (*See* Doc. 7, Ex. 11, pp. 11-13; Ex. 15, pp. 5-8). Petitioner did not even mention that the alleged error deprived him of a fair trial or otherwise violated due process.

A state appellate court deciding whether a trial court committed prejudicial error under state law faces a different legal question than a state court deciding whether such error amounted to a constitutional due process violation. *Petrucelli,* 735 F.2d at 690 (citing *Steele v. Taylor,* 684 F.2d 1193, 1206 (6th Cir. 1982), *cert. denied,* 460 U.S. 1053 (1983)). Therefore, the only legal theories presented to the

state appellate courts were predicated entirely on state law, and were addressed as such by the courts in the state direct review proceedings.[7]

Because petitioner thus failed to provide the state courts with an opportunity to correct the alleged constitutional error, he has waived the federal claim in the absence of a showing of "cause" for his default and actual prejudice as a result of the alleged error, or that failure to consider the claim will result in a "fundamental miscarriage of justice." *See Coleman,* 501 U.S. at 750; *see also Murray,* 477 U.S. at 485; *Isaac,* 456 U.S. at 129; *Sykes,* 433 U.S. at 87.

Petitioner has not demonstrated "cause" for his procedural default.[8] Moreover, as discussed above, *see supra* pp. 8-9, he has not made the requisite showing to establish a credible claim that a "fundamental miscarriage of justice" will occur if the federal due process claim is not considered by this Court.

Accordingly, in sum, petitioner is not entitled to habeas corpus relief based on the claim alleged in Ground One of the petition challenging the admission of "other acts" evidence, because: (1) to the extent petitioner alleges the trial court erred under Ohio law in allowing the evidence, his claim is not cognizable in this federal habeas proceeding; and (2) due to his procedural default in the state courts, petitioner has waived any claim that the alleged state-law evidentiary errors amount to a federal due process violation.

---

[7] The Ohio Court of Appeals, which was the only state court to issue a reasoned decision in the matter, considered and determined the issues as argued by petitioner solely in terms of state law, *i.e.,* that the evidence was not admissible under Ohio's Rules of Evidence, but that the trial court's error was harmless "in light of the overwhelming evidence against Taylor." (Doc. 7, Ex. 13, pp. 12-17). *Cf. Glisson v. Mantello,* 287 F.Supp.2d 414, 437 (S.D.N.Y. 2003) (the petitioner failed to give any "inkling that a federal constitutional claim was being asserted" by citing a state case in his brief on appeal "simply to set forth the harmless error standard in New York courts").

[8] Petitioner concedes in his "traverse" brief that he "did not present the question of ineffective appellate counsel in the state courts so as to preserve the issue for the current consideration of cause and prejudice and . . . is precluded from doing so at this time." (*See* Doc. 14, p. 1). Because petitioner thus procedurally defaulted any ineffective assistance of appellate counsel claim, he cannot rely on such an argument to demonstrate "cause" for his procedural default of the underlying claim of error. *See Edwards v. Carpenter,* 529 U.S. 446, 452 (2000); *Richey v. Mitchell,* 395 F.3d 660, 679 (6th Cir.), *rev'd on other grounds,* 546 U.S. 74 (2005) (per curiam).

12

## C. Petitioner Is Not Entitled To Relief Based On The Prosecutorial Misconduct Claims Alleged In Ground Two

In Ground Two of the petition, petitioner alleges that the prosecutor engaged in "continuous misconduct" during the trial proceedings, which deprived him of his due process right to a fair trial. (Doc. 1, p. 5).

Although the petition itself does not specify the conduct under attack, in his "traverse" brief, petitioner alleges that he was denied a fair trial based on the following instances of misconduct: (1) the prosecutor violated a separation of witnesses order by introducing three of the State's identification witnesses to David Johnson in the hallway outside the courtroom and asking them at that time whether or not Johnson, who was with petitioner at the time of the murders, was the shooter; (2) the prosecutor engaged in misconduct in eliciting the introduction of improper "other acts" evidence at trial; (3) the prosecutor improperly cross-examined petitioner about statements he made during a competency evaluation; and (4) the prosecutor's closing argument "was riddled with improper comments." (Doc. 14, pp. 3-4).[9]

Petitioner raised these same claims to both the Ohio Court of Appeals and Supreme Court of Ohio in the direct appeal proceedings. (*See* Doc. 7, Ex. 11, pp. 14-15; Ex. 15, pp. 8-13). Therefore, they are subject to review on the merits.

The Ohio Court of Appeals was the only state court to issue a reasoned decision addressing the merits of petitioner's claims, which were raised on direct appeal in the fifth assignment of error. The court also addressed other related claims stemming from the alleged violation of the separation of witnesses order and improper admission of "other acts" evidence.

The state appellate court first rejected petitioner's related claims, which were alleged in his third and fourth assignments of error, making findings of fact

---

[9] As respondent points out in the return of writ (*see* Doc. 7, Brief, p. 21), petitioner apparently has abandoned an additional claim, which was raised on direct appeal to the Ohio Court of Appeals, stemming from a Crime Stoppers tip that was revealed by the prosecutor during his opening statement. In any event, the claim is procedurally defaulted, because petitioner failed to assert it in his brief on further appeal to the Supreme Court of Ohio. (*See id.,* Exs. 11, 15).

that are presumed correct,[10] and reasoning in relevant part as follows:

> Taylor's third assignment of error alleges that the trial court erred in failing to enforce its order for the separation of witnesses....

> Prior to the testimony of three eyewitnesses to the murders, the prosecution introduced David Johnson to the witnesses who were seated in the hallway outside the courtroom. The prosecutor asked the witnesses if Johnson was the person who shot Turner and Starkey. One of the witnesses stated that there had also been some discussion with the prosecutor about the witnesses' upcoming testimony.

> Defense counsel made a motion for a mistrial. In the alternative, defense counsel requested that the trial court strike the testimony of the witnesses. Following argument, the trial court stated, "It is unfortunate that you have this informal lineup with all three of your witnesses out in the hallway somewhere. I mean, it wasn't the proper thing to do. However, I am going to overrule your objection. You may argue that to the jury so far as the validity of their identification. It will be overruled, your motion."

> "The purpose of the separation order is 'so that [witnesses] cannot hear the testimony of other witnesses,' . . . and tailor their own testimony accordingly. . . ." Options available to the court if a separation order is violated include the declaration of a mistrial, the striking of the witnesses' testimony, or the giving of a jury instruction as to how the violation may reflect on the witnesses' credibility. . . . The remedy for a violation of a separation order is within the sound discretion of the trial court.

> \*\*\*\*

> The record in the instant case reveals that, at the time that the prosecutor had brought Johnson into the hallway and had spoken to the witnesses, none of the witnesses had testified in court, none of the

---

[10] *See supra* p. 3 n.3.

witnesses had been informed about the contents of the in-court testimony of any other witness, and none of the witnesses had been instructed how to testify at trial. The trial court allowed defense counsel to cross-examine the witnesses about the hallway conversation. There is no indication that any of the witnesses tailored the contents of his or her in-court testimony based upon the hallway conversation. . . .

\*\*\*\*

Taylor's fourth assignment of error alleges that the trial court erred in admitting improper "other acts" evidence in order to show that he had acted in conformity with his "bad character" in killing Turner and Starkey.

\*\*\*\*

Taylor first took the stand in his own defense. Over defense counsel's objection, the prosecutor asked Taylor on cross-examination about his knowledge of guns. The prosecutor also asked Taylor whether he had ever handled or fired a gun, and whether he had ever seen his stepfather with a gun. Taylor testified that he had never fired a gun, and that he had only seen guns on television. Taylor then testified that he had seen Johnson with a gun. Taylor also stated that when he was about eleven or twelve years old, he had seen his stepfather purchase a gun. Taylor stated, in response to a question by the prosecutor, that he was unaware that on the day of the murders there had been handguns and ammunition in his home.

Taylor argues that the trial court erred in permitting the testimony of two rebuttal witnesses for the prosecution. One of the witnesses was the police officer who had searched Taylor's home pursuant to a warrant. The officer testified that he had recovered two handguns and some ammunition from the home. The officer further testified that all of the items had been found in Taylor's stepfather's room, and that none of the items had been used in the Turner and Starkey murders. Further, the officer testified that he had no

15

information connecting Taylor with the items and no information that Taylor had any knowledge about the items.

We hold that the trial court erred in admitting the police officer's testimony. The testimony was improper rebuttal testimony because it did not rebut any testimony given by Taylor. Taylor stated that he had not known that there were any guns or ammunition in his home on the day of the murders. There was absolutely no evidence that Taylor knew about the items found in his stepfather's room. Further, there was no evidence connecting Taylor with any of the items. The evidence was clearly not admissible to prove any of the matters set forth in Evid.R. 404(B) or R.C. 2945.59, because it did not show any acts committed by Taylor. What little probative value the police officer's testimony may have had, if any, was clearly outweighed by the danger of unfair prejudice to Taylor. Therefore, this testimony should have been excluded pursuant to Evid.R. 403(A).

We hold that the trial court erred in admitting the rebuttal testimony of the police officer. However, in light of the overwhelming evidence against Taylor, we hold that the error was not prejudicial.

Taylor also argues that the trial court erred in admitting the rebuttal testimony of a witness who stated that sometime in the six to twelve months preceding the murders, he had been a passenger in Taylor's car when Taylor had almost hit a pedestrian. The witness testified that Taylor and the pedestrian had "had words" and that Taylor had "showed him a gun." Taylor and the witness then drove away, arguing about the wisdom of Taylor's actions.

In admitting the testimony, the trial court stated, "The only reason I'm letting this in is because the defendant has claimed that he never had a gun, didn't own a gun, didn't possess a gun. I'm letting this testimony in, not because of any previous crime or anything like that, but this man claims he saw him within the proximity of the date of the offense that he had a weapon in his hand."

16

We hold that the testimony was not admissible pursuant to Evid.R. 404(B) or R.C. 2945.59 because it did not tend to prove any of the matters enumerated in the rule or the statute.

Further, we hold that the evidence was inadmissible pursuant to Evid.R. 608(B), which provides in part that "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's character for truthfulness, other than the conviction of crime as provided in Evid.R. 609, may not be proved by extrinsic evidence....

\*\*\*\*

The trial court in the instant case indicated that it was admitting the evidence for the purpose of impeaching Taylor's credibility. Apart from Evid.R. 609's exception for certain criminal convictions, a witness's credibility may not be impeached by extrinsic proof of specific instances of conduct. . . . Such conduct may be inquired into only by the intrinsic means of cross-examination within the guidelines set forth in Evid.R. 608(B). . . .

Assuming, for the purposes of argument, that the evidence about the prior incident with the gun was clearly probative of Taylor's truthfulness or untruthfulness so that it was properly the subject of cross-examination, the state was bound by Taylor's responses. . . . The rebuttal testimony offered by the prosecution was clearly extrinsic addressing specific instances of Taylor's conduct. The evidence was inadmissible pursuant to Evid.R. 608(B).

We hold that the trial court erred in admitting the rebuttal testimony about the prior incident involving a gun. We further hold that the error was harmless in light of the overwhelming evidence against Taylor. . . .

(Doc. 7, Ex. 13, pp. 9-17) (state case citations omitted).

17

The court then proceeded to consider petitioner's prosecutorial misconduct claims, rejecting each of these claims in pertinent part as follows:

"In order to reverse a conviction based on prosecutorial misconduct, the alleged misconduct must have deprived the defendant of a fair trial. . . . The prejudicial effect of the alleged misconduct must be considered in the context of the entire trial, and not simply the immediate context in which the misconduct occurred. . . ."

Taylor alleges prosecutorial misconduct in the introduction of improper "other acts" evidence and in the violation of the trial court's separation order. We have addressed these issues under the third and fourth assignments of error. For the reasons set forth under those assignments of error, we hold that Taylor has failed to show that any misconduct of the prosecutor prejudicially affected his substantial rights or deprived him of a fair trial.

\*\*\*\*

Taylor alleges that the prosecutors committed misconduct in questioning him about statements that he made during a competency evaluation, in violation of R.C. 2945.371(J).

The record reveals that the prosecutor questioned Taylor about whether he had been seeing green visions, hearing voices or having hallucinations the day after the murders. Taylor was asked whether he had said that his brother was identified as Satan. Over defense counsel's objection, Taylor was permitted to answer, "No." When Taylor was asked whether he had told anyone that his daily life was one of seeking pleasure, drinking alcohol, smoking marijuana, and not concerning himself with finding work, the trial court sustained defense counsel's objection.

The portion of the cross-examination about which Taylor complains was a small part of the entire cross-examination. The prosecutor did not dwell on any of Taylor's answers to the questions. In addition, the trial court sustained defense counsel's objection to at

least one of the questions. We hold that any error that may have occurred in the overruling of defense counsel's objections to some of the questions on cross-examination was not prejudicial and did not deprive Taylor of a fair trial in light of the overwhelming evidence against him.

Finally, Taylor argues that the prosecutor made improper remarks in his closing argument.

The test for prosecutorial misconduct is whether the prosecutor's remarks were improper, and, if so, whether they prejudicially affected the defendant's substantial rights. . . . Considerable latitude is generally afforded to the prosecutor in presenting closing arguments. . . . The prosecutor's closing argument must be reviewed in its entirety to determine if any remarks were prejudicial. . . . The emphasis is on the fairness of the trial, not on the culpability of the prosecutor. . . .

We have reviewed the prosecutor's closing argument in its entirety. The argument was improper to the extent that the prosecutor urged the jury to consider the inadmissible "other acts" evidence as substantive proof of Taylor's guilt, and to the extent that the prosecutor used the "other acts" evidence to portray Taylor as a gun-carrying individual who had acted in conformity with his bad character in killing Turner and Starkey. Further, the suggestion by the prosecutor that, if Taylor had not been found guilty, then no one would ever be convicted for the murders was improper.

But, we conclude, based on the overwhelming evidence against Taylor, that the jury would have found him guilty even in the absence of the improper remarks. We hold that the prosecutor's remarks did not prejudicially affect his substantial rights or deprive him of a fair trial. . . .

(*Id.,* pp. 17-20) (state case citations omitted).

19

The scope of federal habeas corpus review of petitioner's prosecutorial misconduct claims is narrow because the federal court does not sit as an appellate court with supervisory power to rectify general trial errors. *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974). Although preliminarily the court confronted with a such a claim must determine whether the challenged conduct was improper, a finding of impropriety is not sufficient in itself to amount to a due process violation. *See, e.g., Darden v. Wainwright*, 477 U.S. 168, 179-80 (1986). Rather, as the Ohio Court of Appeals recognized, "[t]he touchstone of due process analysis in such a case is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982).

Where, as here, no specific constitutional right is alleged to have been infringed by the prosecutor, petitioner's allegations concern ordinary trial error, which will not amount to a constitutional violation unless the misconduct "so infected the trial with unfairness as to render the resulting conviction a denial of due process." *Donnelly*, 416 U.S. at 642-43; *see also Darden*, 477 U.S. at 181 ("it 'is not enough that the prosecutor's remarks were undesirable or even universally condemned[;]'" rather, the "relevant question" is whether the prosecutor's challenged conduct rendered the trial fundamentally unfair in violation of due process). The alleged misconduct must be examined within the context of the entire trial to determine whether it deprived the defendant of a fair trial. *United States v. Young*, 470 U.S. 1, 11-12 (1985).

Factors to be considered in weighing whether a prosecutor's misconduct amounts to a due process violation are: (1) the degree to which the misconduct has a tendency to mislead the jury and to prejudice the accused, *see Darden*, 477 U.S. at 182, and *Young*, 470 U.S. at 12; (2) whether the misconduct is isolated or extensive, *see Donnelly*, 416 U.S. at 646; (3) whether the misconduct is deliberate, *see id.* at 647; (4) whether the prosecutor manipulated or misstated the evidence, *see Darden*, 477 U.S. at 182, and *Berger v. United States*, 295 U.S. 78, 84-85 (1935); (5) the strength of the competent proof to establish the guilt of the accused, *see Darden*, 477 U.S. at 182; (6) whether the misconduct was objected to by defense counsel, *see id.* at 182-83 & n.14, and *Young*, 470 U.S. at 13; and (7) whether a curative instruction was given by the trial judge, *see Darden*, 477 U.S.

at 182.[11]

Moreover, even if it is determined that the prosecutor's misconduct amounted to constitutional error, federal habeas relief may not be granted unless such error "had a substantial and injurious effect or influence in determining the jury's verdict." *See Calderon v. Coleman,* 525 U.S. 141, 145 (1998) (quoting *Brecht v. Abrahamson,* 507 U.S. 619, 637 (1993), in turn quoting *Kotteakos v. United States,* 328 U.S. 750, 776 (1946)); *see also O'Neal v. McAninch,* 513 U.S. 432, 435-36 (1995)).[12]

Under this "harmless error" standard, if upon review of the entire record, the court is convinced that "the error did not influence the jury, or had but slight effect," the conviction must stand. *O'Neal,* 513 U.S. at 436-38; *Kotteakos,* 328 U.S. at 764. On the other hand, if the court "is left in grave doubt" and "cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error," the court must find that the error had a substantial influence on the jury and the conviction cannot stand. *O'Neal,* 513 U.S. at 436-38; *Kotteakos,* 328 U.S. at 765.

Upon review of the trial transcripts, including the transcript of the first trial in which the jury was unable to reach a verdict, the undersigned concludes that petitioner has not demonstrated he is entitled to habeas relief based on the errors alleged herein.

---

[11] *See also Gillard v. Mitchell,* 445 F.3d 883, 897 (6th Cir. 2006) (citing *Bowling v. Parker,* 344 F.3d 487, 512-13 (6th Cir. 2003), *cert. denied,* 543 U.S. 842 (2004)), *cert. denied,* 127 S.Ct. 1485 (2007); *Farmer v. Hofbauer,* 1 Fed.Appx. 372, 377-78 (6th Cir. Jan. 10, 2001) (not published in Federal Reporter); *Givens v. Yukins,* 238 F.3d 420 (table), No. 98-2429, 2000 WL 1828484, at **6-7 (6th Cir. Dec. 5, 2000) (unpublished); *Gordon v. Kelly,* 205 F.3d 1340 (table), No. 98-1905, 2000 WL 145144, at **7 (6th Cir. Feb. 1, 2000) (unpublished); *Pritchett v. Pitcher,* 117 F.3d 959, 964 (6th Cir.) (citing *Serra v. Michigan Dep't of Corrections,* 4 F.3d 1348, 1355 (6th Cir. 1993), *cert. denied,* 510 U.S. 1201 (1994)), *cert. denied,* 522 U.S. 1001 (1997).

[12] *Cf. Gordon v. Kelly,* 205 F.3d 1340 (table), No. 98-1905, 2000 WL 145144, at **12 (6th Cir. Feb. 1, 2000) (unpublished); *Hensley v, McGinnis,* 188 F.3d 507 (table), No. 98-1675, 1999 WL 685932, at **3-4 (6th Cir. Aug. 25, 1999) (unpublished).

21

First, to the extent petitioner contends that the prosecutor improperly cross-examined him about statements he made during a competency evaluation, he is unable to establish that error of constitutional dimension occurred. As the Ohio Court of Appeals reasonably found, the trial court sustained defense counsel's objection to one of the questions posed by the prosecutor, which did not elicit any answer from petitioner, as to whether petitioner told anyone that his "daily life was one of seeking pleasure with [his] partners, . . . [d]rinking alcohol, smoking marijuana, watching television, not concerned with finding employment." (*See* Vol. XX, Tr. 2677). To the extent petitioner asserts the question in and of itself was prejudicial, it was an isolated event with little, if any, tendency to mislead the jury in determining petitioner's guilt or innocence on the aggravated murder charges.

Petitioner also has objected to the prosecutor's questions on the issue whether he ever hallucinated or heard voices, and more specifically, whether he ever complained in the Justice Center of "seeing green visions, like stuff happening, with shoes dripping upside down in penises," or ever stated that his "brother was incarcerated in the same pod and . . . [was] Satan." (*Id.,* Tr. 2712-13; *see also* Doc. 7, Ex. 11, p. 15; Ex. 15, p. 10). The trial court allowed this line of questioning, and petitioner lucidly, coherently and reasonably responded to each question posed. (*See* Vol. XX, Tr. 2712-14).[13]

Assuming, *arguendo,* that the prosecutor's questions were improper, it is highly unlikely that this isolated line of questioning, which failed to elicit any prejudicial testimony from petitioner, had any effect on the jury's verdict. Petitioner's mental competency was not at issue during the trial. Moreover, as the prosecutor pointed out during closing argument, it was "not in dispute" that the execution-style shootings were done "purposely" with "prior calculation and design." (Vol. XXI, Tr. 2781-82). Rather, as both counsel emphasized in their closing arguments, the case turned on whether the State had established petitioner's identity as the shooter beyond a reasonable doubt. (*See id.,* Tr. 2782-2915). Because the statements purportedly made by petitioner during his

---

[13] Specifically, petitioner denied that he had ever complained about "seeing green visions." (Vol. XX, Tr. 2713). With respect to the statements he allegedly made about his brother being Satan, petitioner stated: "That's my brother right there in the gray shirt. He's a minister, Bernard Barnes. I have two other brothers. One is Andre Barnes. Malcolm Barnes couldn't make it. He's in Atlanta. That's the only brothers I have." (*Id.,* Tr. 2713-14).

competency evaluation were not relevant to this critical issue, neither party emphasized or mentioned them again as supporting their theory of the case during the trial.

Second, petitioner has not shown that he was denied a fair trial when the prosecutor introduced three of the State's identification witnesses–Kathleen O'Hara, Marc Dellecave and John Brooksbank–to David Dion Johnson in the hallway outside the courtroom and discussed their prospective testimony in Johnson's presence in an effort to "establish" that Johnson was not the shooter as petitioner claimed. (*See* Doc. 14, pp. 3-4). When defense counsel moved for a mistrial or in the alternative that the three witnesses' testimony be stricken, the trial court overruled the motion but agreed that "it wasn't the proper thing to do" to "have this informal lineup with all three of [the State's] witnesses out in the hallway somewhere." (*See* Vol. XVIII, Tr. 2155-58).

The undersigned agrees that the prosecutor exceeded the bounds of propriety by conducting the "informal lineup" of Johnson before a group of three eyewitnesses in the hallway outside the courtroom. However, upon review of the trial transcript, it appears that the purpose underlying the separation order, of preventing witnesses from tailoring their testimony after hearing the in-court testimony of other witnesses, was not undermined in this case. As the Ohio Court of Appeals reasonably found, "[t]here is no indication that any of the witnesses tailored his or her in-court testimony based upon the hallway conversation." (Doc. 7, Ex. 13, p. 11-12).

Indeed, Kathleen O'Hara testified that she only said "hello" to and did not converse with any members of the group talking with the prosecutor. (Vol. XVIII, Tr. 2077). Moreover, consistent with her testimony in the first trial, O'Hara stated she could not positively identify petitioner as the shooter when she picked his picture out of the photo array presented to her soon after the homicides. (*See* Vol. VII, Tr. 401-02; Vol. XVIII, Tr. 2070-73). She also consistently testified that she "couldn't say for sure," but only that it was "possible," that petitioner was the shooter. (Vol. VII, Tr. 402; Vol. XVIII, Tr. 2074, 2080).

Both John Brooksbank and Marc Dellecave testified that they discussed their prior testimony from the first trial in each other's presence that morning with

Mr. Tieger of the Prosecutor's Office.[14] (Vol. XVIII, Tr. 2116-17, 2133-37). However, Dellecave could not remember the substance of the conversation and stated that his prior testimony was not discussed "in specifics." (*Id.,* Tr. 2134-35, 2152-53). Moreover, most importantly, neither Brooksbank's nor Dellecave's in-court testimony varied significantly from their prior trial testimony with respect to the events they witnessed on July 23, 2001 and their separate descriptions and identifications of petitioner as the shooter. (*See* Vol. VII, Tr. 438-86, 488-513; Vol. XVIII, Tr. 2084-2121, 2123-52).

The more troublesome issue created by the "informal lineup" is whether the three witnesses may have influenced one another in their responses to the prosecutor's question concerning the possibility that Johnson may have been the shooter. However, the trial court allowed defense counsel to cross-examine the witnesses about what had occurred in the hallway outside the courtroom and to challenge the "validity of their identification" to the jury on that ground. (Vol. XVIII, Tr. 2158).

It appears from the record that the prosecutor only asked the witnesses in the hallway if Johnson was the shooter they had observed on the evening of July 23, 2001. (*See id.,* Tr. 2106-07). The witnesses all apparently responded in the negative in response to the prosecutor's question, and no further discussion ensued. When questioned at trial, O'Hara testified that she did not believe Johnson was the shooter "based on his build and ... hair size," but as she stated with respect to petitioner, could not "say for certain" that Johnson was not the shooter. (*Id.,* Tr. 2073-74, 2079, 2082). Brooksbank, on the other hand, testified that he was "confident" petitioner was the shooter, as opposed to Johnson, who is "darker-complected than the person . . . identified." (*Id.,* Tr. 2104-05). Finally, Dellecave testified that petitioner, whose "facial expression," eyes and eyebrows are "distinctive," was the person he saw "do the shooting that day," as opposed to Johnson, who "looks totally different" with a darker complexion and dissimilar, "bigger" facial features. (*Id.,* Tr. 2131-32).

Two other eyewitnesses, who were not subjected to the "informal lineup," also testified that Johnson was not the shooter. (Vol. XVII, Tr. 2039-47; *see also*

---

[14] Apparently, police officer David Landesberg also was present during this conversation. (*See* Vol. XVIII, Tr. 2116, ).

24

Vol. XXI, Tr. 2789). The testimony of one of these witnesses, Patricia Meier, was effectively undermined during cross-examination to the extent her testimony in the second trial was significantly more damaging to petitioner than in the first trial, where she testified that she saw only the "silhouette" of the driver/shooter and could not "for sure say it was the defendant." (*See* Vol. XVII, Tr. 2048-52; *see also* Vol. XI, Tr. 980, 982). However, Meier consistently testified in both trials that the driver/shooter was not Johnson. (Vol. XI, Tr. 983, 988; Vol. XVII, Tr. 2047).

Calesha Harris was another eyewitness who testified at both trials. She was one of the few witnesses at the first trial who correctly observed two persons, a driver and passenger, in the shooter's car. Harris stood by her identification of petitioner as the driver/shooter from the photographic array presented to her soon after the murders; although she had not seen Johnson and therefore provided no testimony about him at the first trial, Harris testified at the second trial that the shooter was "not David Johnson," who is "dark-skinned" and "just big." (*See* Doc. 24, Tr. 2164-68, 2174-77, 2197; *see also* Vol. IX, Tr. 741-51; Vol. XXI, Tr. 2789).[15]

Upon review of the trial transcripts, the undersigned is convinced that the prosecutor's error in conducting an "informal lineup" of Johnson before three of the five identification witnesses did not deprive petitioner of a fair trial. It does not appear that the three witnesses subjected to the lineup were influenced by one another in stating in each other's presence outside the courtroom that Johnson was not the shooter. Each witness had their own separate reasons for believing petitioner, as opposed to Johnson, more closely fit the description of the person they had observed on July 23, 2001. Moreover, each witness stood by his or her original degree of certainty in identifying petitioner as the shooter over Johnson. Finally, two additional witnesses, who were not present at the "informal lineup" and thus could not have been tainted by it, corroborated the three witnesses' testimony as to whether or not they saw petitioner or Johnson commit the murders.

_____

[15] Apparently, Calesha Harris also was introduced by Mr. Tieger to David Johnson in the hallway outside the courtroom, but she was not with any of the other eyewitnesses at the time. (*See* Doc. 24, Tr. 2197).

Finally, petitioner has not demonstrated that he is entitled to habeas relief based on his allegations of impropriety by the prosecutor in eliciting the improper admission of "other acts" evidence at trial and in his closing argument, which petitioner contends was "packed with improper comments" emphasizing these "other acts" and remarking upon the following additional matters: "the defense expert . . ., vouching . . ., . . . their violation of the separation order . . ., and a suggestion that if [petitioner] was not convicted for the homicides, no one would be. . . ." (Doc. 7, Ex. 11, p. 15; *see also id.,* Ex. 15, p. 11).

The undersigned has reviewed the transcript pages cited by petitioner in support of each of his claims challenging the prosecutor's remarks during closing argument and, like the Ohio Court of Appeals, finds that the prosecutor neither engaged in the improper vouching of witnesses nor exceeded the bounds of propriety in his passing comments about the defense expert and "the way we showed David Johnson to the witnesses," which was a matter allowed into evidence and also allowed to be hotly contested by the defense at trial. (*See* Vol. XXI, Tr. 2792, 2884, 2891; *see also* Vol. XVIII, Tr. 2073-81, 2104-09, 2132, 2138; Vol. XXI, Tr. 2821-25, 2828-29, 2833-34).[16]

The undersigned further agrees with the Ohio Court of Appeals' determination that the prosecutor's closing argument was "improper" to the extent the prosecutor suggested that no one would be found guilty for the murders if petitioner were acquitted, as well as to the extent the prosecutor urged the jury to consider . . . inadmissible 'other acts' evidence as substantive proof of [petitioner's] guilt, and . . . used the 'other acts' evidence to portray [petitioner] as a gun-carrying individual who had acted in conformity with his bad character in killing Turner and Starkey." (Doc. 7, Ex. 13, p. 20; *see also* Vol. XXI, Tr. 2784-85, 2902-03, 2909).

The Ohio Court of Appeals went on to summarily conclude that these improper remarks did not rise to the level of a due process violation. (Doc. 7, Ex. 13, p. 20). Upon review of the challenged remarks, the undersigned agrees with

---

[16] As discussed *supra* pp. 22-24, the undersigned has concluded that it was reasonable for the Ohio courts to determine that the prosecutor's alleged misconduct in conducting an "informal lineup" of Johnson in violation of the trial court's separation of witnesses order did not deprive petitioner of a fair trial.

this determination to the extent that it is highly doubtful the jury would have been swayed to convict petitioner based on the following isolated, general comment contained in the prosecutor's lengthy closing argument specifically addressing each item of evidence against petitioner: "If Montez Taylor is found not guilty, this case is over with because the only evidence against David Johnson is [Taylor's] testimony, and [Taylor] is an admitted liar." (Vol. XXI, Tr. 2784-85). In any event, defense counsel reduced, if not eliminated, any risk of prejudice when he later argued in response to this statement that "the appeal to you [the jury] that if you don't convict Montez Taylor, that you don't convict anyone, is not justice. That thought process should completely leave your mind if it even ever rested there for a second." (*Id.,* Tr. 2796-97).

The prosecutor's comments made in rebuttal argument about firearms and ammunition that were seized from petitioner's stepfather's bedroom upon execution of a search warrant of petitioner's home are more problematic. (*See id.,* Tr. 2902-03). However, it was reasonable for the Ohio appellate court to conclude that these remarks did not render petitioner's trial fundamentally unfair.

To a large extent the remarks were invited, *see United States v. Robinson,* 485 U.S. 25, 33-34 (1988), given that defense counsel had argued at great length in his closing argument that none of the items seized were in plain view and, therefore, the jury could not infer from such evidence that petitioner knew about them or that petitioner should be found guilty "by association" simply because guns, not linked to the homicides in question, are "bad" and were found in his home. (*See id.,* Tr. 2872-74). The trial court had permitted the evidence to be introduced, not as "other acts" evidence under Ohio R. Evid. 404(B), but rather as evidence the jury could consider in assessing the credibility of petitioner's testimony that he had only seen weapons in movies. (Vol. XX, Tr. 2770). The prosecutor's response to defense counsel's closing remarks, limiting consideration of the evidence as permitted by the trial court to the issue of petitioner's credibility, was neither deliberate nor unduly prejudicial. (*See id.,* Tr. 2902-03).

Even assuming that the prosecutor's remarks were sufficiently prejudicial to trigger fair trial concerns based on the Ohio Court of Appeals' determination on direct appeal that the trial court erred in admitting the rebuttal testimony in the first instance, the undersigned concludes that the error did not have a substantial and injurious effect or influence on the jury's verdict. *See Brecht,* 507 U.S. at 637.

Testimony was elicited at trial that there was "absolutely no information" connecting petitioner with the firearms and ammunition found in his stepfather's room or as showing petitioner's "ever being in that room or looking around and

knowing about those items." (Vol. XX, Tr. 2763-64). Moreover, it was established that none of the items obtained from petitioner's home "ha[d] anything to do with" the homicides charged against petitioner. (*Id.,* Tr. 2764-65). It, therefore, is highly unlikely that the jury would have given any weight to such evidence as substantive proof of petitioner's guilt. Moreover, when balancing the arguments made by both the prosecutor and defense counsel at the close of the case about the weight to be accorded such evidence in determining the credibility of petitioner's trial testimony, the undersigned concludes that the rebuttal evidence at most had only a slight effect on the jury's assessment of the credibility issue.[17]

Of most concern are the comments made by the prosecutor regarding the State's rebuttal witness, John Thomas, who testified only at petitioner's second trial. Thomas presented damaging testimony that in the months preceding the murders, he was a passenger in petitioner's car; that petitioner almost hit a pedestrian; and that the pedestrian "got loud and started cussing [petitioner] out." (Vol XX, Tr. 2738-39). According to Thomas, at that point, petitioner "did a U-turn and asked [the pedestrian] what did he say to him? And then . . . they was arguing whatever" and petitioner "showed him a gun," which Thomas went on to describe in detail. (*Id.*, Tr. 2739-41).

Thomas's testimony was permitted at trial over numerous objections lodged by defense counsel. (*Id.,* Tr. 2738-41). The trial court explained:

> The only reason I'm letting this in here – let's put this on the table. The only reason I'm letting this in is because the defendant has claimed that he never had a gun, didn't own a gun, didn't possess a gun.
>
> I'm letting this testimony in, not because of any previous crime or anything like that, but this man claims he saw him within the proximity of the date of the offense that he had a weapon in his hand.
>
> That's the only reason I'm letting it in.

---

[17] This conclusion is bolstered by the fact that petitioner's first trial, where the same rebuttal evidence was presented (*see* Vol. XII, Tr. 1134-44), ended in a hung jury.

28

(*Id.*, Tr. 2742).

The prosecutor did not mention Thomas's testimony again until his rebuttal argument, which was invited to the extent defense counsel had attempted in closing argument to discredit Thomas's credibility and stated: "If you accept the evidence that he [Thomas] testified, does that have anything to do with whether Montez Taylor shot and killed these two gentlemen? It doesn't obviously." (*See* Vol. XXI, Tr. 2862-63). In response, the prosecutor challenged the credibility of petitioner's testimony that "he's only seen guns on TV and the movies" and "saw David Johnson one time with a gun," as follows:

> But John Thomas told you what happened, that Montez Taylor pulled a gun out from underneath his seat and flashed it at an individual he was having a traffic dispute with. . . .

(*Id.*, Tr. 2908-09). Over defense counsel's objection, the prosecutor went on to point out that one of the guns found in petitioner's home was "a rare Tanfoglio, the same brand of gun . . . that could have been used in the killing." (*Id.*).

The Ohio Court of Appeals determined that Thomas should not have been permitted to testify as a State rebuttal witness, even for the sole purpose permitted by the trial court of challenging petitioner's credibility in light of his testimony on cross-examination regarding his lack of knowledge of and experience with guns. (Doc. 7, Ex. 13, pp. 16-17). In contrast to the evidence seized during the search of petitioner's parents' home, Thomas's testimony concerned a prior bad act allegedly committed by petitioner within a year of the incident in question under circumstances indicating that petitioner not only possessed a gun within easy reach in his automobile but also possessed the temperament to commit the homicides charged against him. In his rebuttal argument, the prosecutor compounded the risk of prejudice because he did not limit his remarks about Thomas's testimony to petitioner's credibility, but also improperly suggested it constituted substantive evidence of guilt when viewed in conjunction with a type of firearm found in petitioner's home that was similar to the one used to kill Turner and Starkey.

As Judge Painter cautioned in his concurring direct appeal opinion, the prosecutor's error in eliciting and improperly referring to John Thomas's "other acts" testimony could have been "fatal" in a close case. (Doc. 7, Ex. 13, p. 20).

The prosecutor came dangerously close to crossing that line here.

Upon review of the trial transcripts, it appears problems arose at the very beginning when the police failed to investigate certain eyewitness accounts reporting that two people were in the shooter's car and, most significantly, failed to pursue David Johnson as a possible suspect based on a Crime Stoppers tip that Johnson was with petitioner when the Starkey and Turner were killed. At petitioner's first trial, the prosecution proceeded on the theory that only one person, petitioner, was in his car when the shootings occurred. (*See* Vol. VI, Tr. 237-38). Apparently, Johnson was located in California during the trial and brought back to testify for the State as the penultimate witness of its case-in-chief.[18] (*See* Vol. X, Tr. 883-943).

During Johnson's questioning, it was revealed for the first time that Johnson, who fled to California a few days after the murders, in fact was in the car as petitioner had claimed and had been involved in an argument with one of the victims earlier in the day. (*Id.,* Tr. 886-96). When Johnson's examination ended, the trial judge expressed his frustration with the "abominable investigation" that had been conducted by the State given that "all of a sudden we have a guy at the last minute who was there[,]" an "important witness" who was not " too hard to find" and whose picture was never presented to the eyewitnesses for identification purposes. (*Id.,* Tr. 945-48).

The undersigned gives little credence to either petitioner's or Johnson's self-exculpatory testimonies, which were effectively undermined on cross-examination, pointing the finger at each other as the person solely responsible for the murders.[19] However, as the prosecutor pointed out during closing argument, the primary evidence against petitioner was "not Montez Taylor versus David Johnson," but rather the testimony of the eyewitnesses who identified petitioner, not Johnson, as the shooter. (*See* Vol. XXI, Tr. 2786).

---

[18] The last witness for the State's case-in-chief was Patricia Meier, who apparently initially had been subpoenaed by the defense because she was an eyewitness who had reported to the police that she saw two people in the shooter's car. (*See* Vol. X, Tr. 952-53; Vol. XI, Tr. 977-92). Meier was in the courtroom when Johnson testified at the first trial, and was the only eyewitness who testified at that trial that Johnson was not the driver/shooter.

[19] *See* Doc. 24, Tr. 2205-2309; *see also* Vol. XX, Tr. 2645-2734.

As defense counsel emphasized in his closing argument, there were inconsistencies in the various eyewitnesses' accounts of the shootings and their descriptions of the shooter. In addition, the State would have presented a stronger case if the eyewitnesses had picked out petitioner's picture from a photographic array presented soon after the homicides occurred, which included a photograph of Johnson. (*See id.,* Tr. 2815-39).

Nevertheless, on review of the transcripts of petitioner's trials, and "after pondering all that happened without stripping the erroneous action from the whole," the undersigned is not "left in grave doubt" and can say "with fair assurance" that the prosecutor's error in eliciting and remarking on Thomas's prejudicial testimony did not have a "substantial and injurious effect or influence in determining the jury's verdict." *O'Neal,* 513 U.S. at 436-38; *Brecht,* 507 U.S. at 637.

First, defense counsel effectively reduced the prejudicial impact of the "other acts" evidence by eliciting testimony from Thomas that he was a good friend of the murder victims, who were like "family" to him, had a record showing a prior conviction for a crime of dishonesty, and did not come forward with his story about an event that purportedly happened one and one-half years earlier until one month before petitioner's second trial. (*See* Vol. XX, Tr. 2743-54). Moreover, during his closing argument before the jury retired to deliberate, defense counsel emphasized these points and other factors tending to undermine Thomas's credibility as a witness. (*See* Vol. XXI, Tr. 2862-63).

Second, although some of the identification witnesses were more certain than others in their selection of petitioner as the shooter from the photo array presented by the police soon after the homicides occurred, they all without exception selected petitioner's photograph from that array. Moreover, the four witnesses who picked petitioner's picture from the photo array, as well as Patricia Meier, all testified that it was their belief that Johnson was not the shooter. It appears from the record, which includes photographs of both petitioner and Johnson, that the two men were easily distinguishable from each other in terms of

31

build, skin color, facial features and hair style.[20]  Therefore, the likelihood of misidentification by all of these witnesses is, at best, negligible.

Petitioner contends in his "traverse" brief that because his first trial resulted in a hung jury, the "other acts" evidence introduced for the first time at his second trial must have substantially affected the jury's verdict. (Doc. 14, p. 6). As petitioner has argued, the fact that the jury was unable to reach a verdict in the first trial is a factor to consider for purposes of harmless error analysis, but it is not dispositive. *See, e.g., Zappulla v. New York,* 391 F.3d 462, 485 n.14 (2nd Cir. 2004), *cert. denied,* 126 S.Ct. 472 (2005); *United States v. McLendon,* 378 F.3d 1109, 1115 (D.C. Cir. 2004) (citing *United States v. Williams,* 212 F.3d 1305, 1311 n.10 (D.C. Cir.) (in finding that the "most significant factor" negating the impact of erroneously admitted testimony was "the weight and nature of the evidence" against the defendant, the court rejected the dissent's conclusion that the defendant's second trial "necessarily presented a close case" because the first trial resulted in a hung jury and "advise[d] caution in assigning critical significance to the failure of a different jury, which heard different evidence and argument, to reach agreement"), *cert. denied,* 531 U.S. 1056 (2000)).[21]

In contrast to the second trial, the State's theory of the case changed radically in petitioner's first trial when Johnson came forward for the first time to testify as the penultimate witness in the State's case-in-chief that he was with petitioner when the murders occurred, had argued with one of the victims earlier that day, and had moved to California a few days later.  As the trial judge made

---

[20]  Indeed, upon review of the photographs of Johnson and petitioner (Doc. 25), the undersigned was struck by the significant differences in their facial features as well as their skin color and bulk. It is doubtful that the witnesses would have confused the two men, particularly given, as one witness pointed out at trial, petitioner's distinctive eyes and eyebrows. (*See* Vol. XVIII, Tr. 2131).

[21]  *But cf. United States v. Stevens,* 935 F.2d 1380, 1406-07 (3rd Cir. 1991) (the error was not harmless "[g]iven the apparent closeness of the evidence" presented in both the second and first trial in which the jury was unable to reach a verdict); *United States v. Thornton,* No. CRIM. 99-600, Civ. 04-28, 2005 WL 1993843, at *4 (E.D. Pa. Aug. 17, 2005) (unpublished) (and cases cited therein) (because the petitioner's first trial ended with a hung jury and "the only new evidence at the second trial was . . . extremely prejudicial propensity evidence" that was improperly introduced by defense counsel, "there is a reasonable probability that the jury's verdict would have been different but for defense counsel's deficiency").

32

clear, this "last minute" testimony raised serious, unanswered questions about Johnson's role in the incident, which had never been investigated by the police. All of the eyewitnesses, who had identified petitioner as the shooter from the photo array, had already testified for the State by the time Johnson appeared in court. Only Patricia Meier, a witness who had not identified the shooter from the photo array, testified at the first trial that the driver/shooter was not Johnson and more closely fit petitioner's description. (*See* Vol. XI, Tr. 983, 987-88).

In contrast to petitioner's first trial, at the second trial, the four persons who had initially picked petitioner's picture out of the photo array testified in addition to Meier that, unlike petitioner, Johnson did not fit the shooter's description. The reasons given by each witness for reaching this conclusion were remarkably similar. Johnson was bigger, had a darker complexion, and had facial features and a hair style which did not fit the driver/shooter's unique characteristics. Therefore, the fact that the jury was unable to reach a verdict in the first trial is not dispositive here.

Accordingly, in sum, upon review of the trial transcripts, as well as the photo array and photographs of petitioner and Johnson that were admitted into evidence at petitioner's second trial, the undersigned concludes that the jury was not substantially affected or influenced by the prosecutor's misconduct in eliciting and referring to John Thomas's prejudicial rebuttal testimony about a prior incident in which petitioner allegedly pulled out a gun during an altercation with a pedestrian. Moreover, as discussed above, *see supra* pp. 21-27, petitioner has not demonstrated that the prosecutor's other alleged errors deprived him of a fair trial.

Therefore, petitioner is not entitled to habeas relief based on the prosecutorial misconduct claims alleged in Ground Two of the petition, which were asserted by him in the state direct appeal proceedings and in his brief in response to the return of writ.

## IT IS THEREFORE RECOMMENDED THAT:

1. Petitioner's petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Doc. 1) be DENIED with prejudice.

2. A certificate of appealability should not issue with respect to the claims alleged in Grounds One, Three and Four of the petition, which this Court has concluded are waived and thus procedurally barred from review, because "jurists of reason" would not find it debatable whether this Court is correct in its procedural rulings. *See Slack v. McDaniel,* 529 U.S. 473, 484-85 (2000).[22]

A certificate of appealability should issue with respect to petitioner's remaining claims of prosecutorial misconduct alleged in Ground Two of the petition, which have been addressed on the merits herein, because petitioner has made a substantial showing of a "viable claim of the denial of a constitutional right" or that is "adequate to deserve encouragement to proceed further." *See Slack,* 529 U.S. 473, 475 (2000) (citing *Barefoot v. Estelle,* 463 U.S. 880, 893 & n.4 (1983)); *see also* 28 U.S.C. § 2253(c); Fed. R. App. P. 22(b).

3. With respect to any application by petitioner to proceed on appeal *in forma pauperis,* the Court should certify pursuant to 28 U.S.C. § 1915(a)(3) that an appeal of any Order adopting this Report and Recommendation would be taken in "good faith," and therefore GRANT petitioner leave to appeal *in forma pauperis* upon a showing of financial necessity. *See* Fed. R. App. P. 24(a); *Kincade v. Sparkman,* 117 F.3d 949, 952 (6th Cir. 1997).

Date: 6/20/07

cbc

Timothy S. Black
United States Magistrate Judge

K:\BRYANCC\2007 habeas orders\05-526RR.waiv-OhSCt-fedQ.prosmisc.wpd

---

[22] Because this Court finds that the first prong of the two-part *Slack* standard has not been met in this case, it need not address the second prong of *Slack* as to whether or not "jurists of reason" would find it debatable whether petitioner has stated a viable constitutional claims for relief in Grounds One, Three and Four. *See Slack,* 529 U.S. at 484.

34

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

Montez L. Taylor,
    Petitioner,

                                  Case No. 1:05cv526

      v.                        (Weber, S.J.; Black, M.J.)

Ernie Moore,
    Respondent.

## NOTICE

Attached hereto is a Report and Recommendation issued by the Honorable Timothy S. Black, United States Magistrate Judge, in the above-entitled habeas corpus action. Pursuant to Fed. R. Civ. P. 72(b), which may be applied in this action under Rules 1 and 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, any party may object to the Magistrate Judge's Report and Recommendation within ten (10) days after being served with a copy thereof. Such party shall file with the Clerk of Court and serve on all other parties written objections to the Report and Recommendation, specifically identifying the portion(s) of the proposed findings, recommendations, or report objected to, together with a memorandum of law setting forth the basis for such objection(s). Any response by an opposing party to the written objections shall be filed within ten (10) days after the opposing party has been served with the objections. *See* Fed. R. Civ. P. 72(b). A party's failure to make objections in accordance with the procedure outlined above may result in a forfeiture of his rights on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).